WILTON L. BATTLES, JR., *et al.*, Plaintiffs-Appellants, v. LA SALLE NATIONAL BANK *et al.*, Defendants-Appellees.—WILTON L. BATTLES *et al.*, Plaintiffs-Appellees, v. GERALD E. ANDERSON, Defendant-Appellant.

First District (3rd Division)   Nos. 1—90—3216, 1—90—3370, 1—90—3451 cons.

Opinion filed December 30, 1992.—Rehearing denied February 5, 1993.

Donald L. Johnson, of Chicago, for Wilton L. Battles, Jr., and William P. Rizzo.

Robert Habib, of Chicago, for Gerald E. Anderson and La Salle National Bank *et al.*

JUSTICE CERDA delivered the opinion of the court:

Plaintiffs, Wilton L. Battles, Jr., and William P. Rizzo, sued defendant, Gerald E. Anderson, for breach of fiduciary duty for selling their partnership real estate to a third party. Defendant's defense was that the partnership had previously been terminated by mutual agreement of all three partners. Prior to trial, defendant moved for summary judgment on the grounds that Illinois law requires an accounting and a full review of partnership affairs before an action at law can be heard. The trial court denied the motion and the case was tried before a jury.

The jury held defendant liable and awarded plaintiff Battles $60,000 and plaintiff Rizzo $50,000 in compensatory damages. The jury awarded punitive damages in the amount of $0.

Plaintiffs appeal the trial court's denial of their motion for a new trial on damages only. Defendant appeals the trial court's denial of his motion for a judgment notwithstanding the verdict in which he renewed his argument that the case should never have gone to trial since an accounting was required. The appeal involves count II of a multicount complaint, which alleges that defendant breached his fiduciary duty to plaintiffs. We affirm both appeals.

At issue is whether a partner may sue another partner without requesting a final accounting where the damages sought were for breach of fiduciary duty in disposing of partnership property.

The initial facts are undisputed. In January 1981, plaintiffs entered into an oral agreement with defendant concerning the development of property in Des Plaines, Illinois. The oral partnership agreement provided:

(1) The three parties would become equal shareholders of Dolphin Land Development Corporation (Dolphin), which was used as nominee to obtain options;

(2) Plaintiffs would acquire options to three parcels of property and would do the work necessary to have the property rezoned, including the land planning, architectural plans, preparation of plans for the property as developed, traffic studies, engineering studies, plans, and the zoning presentation to the municipality;

(3) Defendant would provide the money necessary to acquire the property and advance the funds to pay for the preliminary plans and studies;

(4) The partnership would obtain a construction loan for an office building once the parcels were assembled and rezoned;

(5) The three partners would seek tenants for the building themselves and through brokers;

(6) Each partner would have an ownership interest of one-third and that each would share in the profits and losses equally; and

(7) Before plaintiffs would receive any profits or other distributions, defendant would be reimbursed for the money he advanced to acquire the property and to pay for the preliminary costs and expenses.

On March 17, 1981, Dolphin distributed 333 shares of stock to each partner and one share to William P. O'Keefe. Through the Dolphin entity, plaintiffs acquired options on the parcels in Des Plaines on behalf of the partnership. The property was successfully rezoned in the fall of 1982.

The remaining facts are contested. According to plaintiffs, defendant informed them in the summer of 1982 that he wanted a new lawyer, Paul Rosenblum, to represent the partnership. Plaintiffs agreed, and Rosenblum became the partnership's attorney in September 1982. Defendant claims that Rosenblum represented him individually, not the partnership.

Rosenblum testified that he initially became involved with the Dolphin project when he participated in negotiations of a joint venture agreement with a savings and loan institution. Later, he was

involved in the closing transactions of the three parcels. He also testified, however, that he told plaintiffs that he represented only defendant and that they should obtain their own counsel to represent their interest in the negotiations. In contrast, Rizzo testified that Rosenblum did not tell him at the meeting that he represented only defendant and that plaintiffs had a right to obtain their own attorney.

On January 18, 1983, Rosenblum sent a letter to defendant and Battles advising that the property's closing was imminent and its escrow had been opened. Defendant then set up a meeting with the three partners in Rosenblum's law office regarding the property's acquisition and development. According to Battles, defendant told him that the meeting was to discuss the final details of a pending financing arrangement. Battles testified that Rosenblum and defendant informed him and Rizzo at the January 19 meeting that they had to sign a memorandum of understanding (Memorandum) in order to get the financing to close on the first parcel. Plaintiffs contend that defendant and Rosenblum explained that defendant had to be in sole control of the property's title in order for the partnership to acquire the money to close on the first optioned parcel. According to plaintiffs, defendant and Rosenblum represented that the execution of the Memorandum would not affect plaintiffs' interest in the partnership or the property owned by the partnership and that defendant would be acting for and on behalf of the partnership. Relying on those representations, plaintiffs signed the Memorandum.

The Memorandum provided that plaintiffs assigned all their rights in the property to defendant. Plaintiffs testified that they never intended or agreed to give up their property or partnership rights. Defendant denies that he had made false representations to plaintiffs regarding the reason they should sign the Memorandum, which defendant maintains dissolved the partnership.

In defendant's response to plaintiffs' appeal, he asserts that Rosenblum testified at trial that the Memorandum was used to protect Battles against a $40,000 judgment by Golf Mill State Bank and was presented to the bank with Battles' knowledge in the pending citation proceedings. The record indicates, however, that Rosenblum stated that he sent a letter to defendant, with copies to Battles, proposing to send Golf Mill State Bank a copy of the Memorandum, which negates plaintiffs' having any future interest in the property's development. Rosenblum testified that he did not remember whether the bank had obtained a judgment against Battles. In addi-

tion, Rizzo testified that Battles' financial problems with the bank were discussed in a general way at the January 19 meeting, but he did not know about a judgment.

Regarding the January 19 meeting, Rosenblum testified that his impression was that plaintiffs knowingly relinquished any interest they had in the property. According to Rosenblum, he prepared the Memorandum during the meeting and neither plaintiff objected. Rosenblum further testified that defendant clearly stated he would not invest any more money in this project unless he had sole control.

Rosenblum denied telling plaintiffs that the document was merely required in order to tell Merchants National Bank that defendant was the sole owner so that financing could be obtained. Furthermore, Rosenblum testified, after January 19, 1983, defendant was free to negotiate with anyone he chose in the sale of the property.

Also on January 19, 1983, Rosenblum drafted an instrument by which Dolphin assigned all its contract rights to the partnership property to the Merchants National Bank of Aurora, as trustee under trust number 344. Plaintiffs testified that this assignment was made in reliance on the statements and promises of defendant and Rosenblum.

At that same meeting, Battles agreed that the $4,500 real estate commission due him on the purchase of partnership property would be used for the partnership's benefit. Battles testified that he would not have contributed his commission to the deal if he were giving up his rights in the partnership. When a closing occurred on one of the parcels in February 1983, the commission went toward the purchase price and Rosenblum's legal fees.

After January 19, 1983, Rosenblum and other attorneys of his law firm were involved with Battles and defendant in negotiations with potential lenders, potential joint venture partners, and in search of tenants for the development. On March 25, 1983, Rosenblum sent a letter to Hugo Tagli, who was the attorney for the sellers of the second parcel. The letter was an option agreement between defendant and the seller. Copies of the letter went to defendant and Battles, but only defendant got the agreement. Rosenblum sent letters about the option to defendant with a copy to Battles on April 6, 1983, and April 15, 1983. On April 28, 1983, Rosenblum sent Battles copies of the executed option agreements on the remaining two parcels. During the fall of 1983, Rosenblum stopped sending Battles copies of his correspondence with defendant regarding the parcels.

Throughout 1983 and until June 20, 1984, plaintiffs and defendant attempted to secure tenants and a construction loan for their proposed building. Battles testified that he had about 27 meetings after January 19, 1983, regarding the development. Nineteen of those meetings included defendant. At those meetings, Battles and defendant held themselves out as partners to lenders, brokers, mortgage bankers, prospective tenants, and others by expressly stating that they were partners with regard to the property.

Stephan Pojman, a real estate and mortgage loan broker, testified that he worked with Battles and defendant in 1983 to obtain a loan commitment for the Dolphin project. During a meeting in March 1983, Battles and defendant represented that they were partners. When Battles was out of the room, defendant complained to Pojman that he was a one-third partner yet he was expected to come up with all the money for the venture.

Jay Wheeler, vice-president of First Interstate Mortgage Company, testified that he met with Battles and defendant in March 1983 regarding the Dolphin project. At the meeting, both men told Wheeler that they were partners. Wheeler was informed that Battles was handling the zoning and planning while defendant was the financial partner. On June 13, 1983, Wheeler sent a letter to both men exploring potential financing for the project.

On February 28, 1984, Rosenblum advised the subsequent purchaser that he should promptly pay the creditors and strike whatever deal was necessary with plaintiffs. The purchaser then closed on the first of the three parcels. The remaining two parcels closed later in 1984. Rosenblum prepared the documents for the purchase of defendant's interest in the property.

In June 1984, the partnership began receiving rental income, which Battles collected and deposited in Dolphin's checking account. Defendant claims that he had no knowledge of the existence of those rental incomes.

Plaintiffs testified that they were not aware that defendant had made agreements to sell the property and options until June 20, 1984, when defendant informed them that he had conveyed his interest in the partnership property. At first, plaintiffs were happy that defendant sold his one-third interest to a financial source because they thought it meant that they finally could go ahead with the project. However, when Battles asked defendant for the purchaser's phone number so that he could call his new partner, defendant refused. The meeting then came to an abrupt end.

After the meeting, plaintiffs obtained a new attorney, Tobin Richter, and gave the subsequent purchaser notice of their legal interest in the property. Richter testified that defendant informed him that he conveyed the property to a third party to shield it from his wife, who had sued him for divorce.

On July 31, 1984, plaintiffs filed a lawsuit against several defendants for a constructive trust. Count II of plaintiffs' fifth amended complaint made claims against defendant for breach of his fiduciary duty to plaintiffs. During discovery, plaintiffs learned that defendant had let the options on the other two parcels lapse. Then, a short time later, he picked up the options at the same price to which the partnership had agreed.

On May 29, 1990, defendant filed a motion for summary judgment and a supporting memorandum of law in which he argued that a general partner cannot sue another general partner in Illinois until a final accounting of the partnership has been obtained. Since plaintiffs had not requested a final accounting, defendant maintained that the lawsuit was premature. Plaintiffs responded that a partner could sue another partner where the damages sought belonged to the partner and not the firm. The trial court denied the summary judgment.

Neil King, a real estate appraiser, testified as an expert witness for plaintiffs. King stated that the property had a fair market value at the time of trial of $2.548 million. Because of the relationship of the property to adjoining landlocked property, King opined that the property value increased to $3.8 million. King admitted on cross-examination, however, that the owner of the adjoining property was unable to get the necessary zoning and had no plans to obtain the property.

At the close of plaintiffs' case in chief, defendant moved for a directed verdict on the grounds that there was insufficient evidence for the jury to determine damages and that sections 38 and 40 of the Uniform Partnership Act (Ill. Rev. Stat. 1987, ch. 106½, pars. 38, 40) provided that there could only be a distribution of assets after the creditors, including the creditor partner, had been paid. The trial court denied the directed verdict.

The case went to the jury on the issue of whether defendant had breached his fiduciary duty as a partner and, if so, what damages would be awarded. The jury awarded Battles $60,000 and Rizzo $50,000 in compensatory damages. They also signed a verdict form awarding punitive damages to both plaintiffs, but filled in the amount of the award as $0.

Defendant filed a motion for a judgment notwithstanding the verdict, claiming that the lawsuit was fatally premature because a full review of partnership affairs was absolutely required to determine whether defendant's actions caused plaintiffs any damage. Plaintiffs filed a motion for a new trial on the damages only. Both motions were denied and this appeal followed.

The main issue raised by defendant on appeal is whether this lawsuit is premature because Illinois law requires an accounting of the partnership affairs before damages can be determined. Initially, plaintiffs reply that the denial of defendant's summary judgment motion is not reviewable by this court because it merged into the trial.

■ When an issue raised in a denied motion for summary judgment is then decided at trial, the order denying the summary judgment is merged into the judgment entered at trial and is generally not appealable. (*Carpenter v. Mobile World, Inc.* (1990), 194 Ill. App. 3d 830, 838.) The rationale for this rule is that it would be unjust to the prevailing party, who won a judgment after the evidence was more completely presented. *In re Marriage of Adams* (1988), 174 Ill. App. 3d 595, 607.

In this case, however, the issue of whether an accounting was necessary was a question of law that was not before the jury. The jury entered its verdict on the issue of whether defendant breached a fiduciary duty and the damages to be awarded. The summary judgment denial did not merge into the judgment because the trial did not deal with the issue raised in the motion for summary judgment. Therefore, the trial court's denial of the motion for summary judgment is properly reviewable by this court.

Before considering the main issue, we point out that both parties raise several arguments that either contain no cites to the record or are not supported by evidence in the record. Therefore, we do not consider those arguments.

■ The main issue is whether this lawsuit is premature because there was no prior accounting of the partnership affairs. Generally, a partner cannot sue a copartner on a matter concerning the partnership until there has been a final settlement of the partnership accounts. (See *Frink v. Ryan* (1841), 4 Ill. 322, 326; *Schlossberg v. Corrington* (1980), 80 Ill. App. 3d 860, 866; *Marcus v. Green* (1973), 13 Ill. App. 3d 699; *Mayhew v. Craig* (1929), 253 Ill. App. 238, 241.) The rationale behind this rule is that the resolution of disputes between partners on partnership matters usually entails a complete accounting in order to ascertain that the partner who

claims some amount from his copartner is not liable to his copartner in connection with other partnership debts. *Mayhew*, 253 Ill. App. at 241.

This rule has been explained in several ways. In *Marcus* (13 Ill. App. 3d at 708-09), the court listed numerous exceptions to the rule that made the rule inapplicable, including when the joint property has been wrongfully destroyed or converted or when one partner has been guilty of fraud that results in defeating the rights of the complaining party. The court in *Balcor Income Properties, Ltd. v. Arlen Realty, Inc.* (1981), 95 Ill. App. 3d 700, 702, expressed that a partner or partnership can bring an action against a copartner only if the plaintiff's claim can be decided without a full review of the partnership accounts.

■ We find that an accounting is not necessary in this case. The lawsuit can be resolved without a full review of the partnership's accounts. The partnership agreement was that defendant would advance any necessary funds and that plaintiffs would contribute their time and expertise in obtaining the zoning and other pertinent matters. It was only when the partnership was making a profit that defendant would have been entitled to be reimbursed. Before the partnership could make a profit, however, defendant wrongfully transferred all the partnership's interest to a third party, thus causing a wrongful termination of the partnership. Furthermore, the jury considered all the relevant financial data when it determined the damages for defendant's breach of fiduciary duty.

■ We disagree with defendant's assertion that the dissolution of the partnership occurred when the Memorandum was signed. There was no dissolution because after the Memorandum was signed, defendant held out to the world that plaintiffs were his partners. A partner's conduct is considered wrongful when it is done in derogation of the duties imposed by the partnership agreement or by virtue of the nature of the partnership itself. (*Monteleone v. Monteleone* (1986), 147 Ill. App. 3d 265, 269-70.) Parenthetically, we observe that defendant did not appeal the jury verdict finding that he breached his fiduciary duty to plaintiffs.

■ Defendant asserts that his rights are covered by section 38(2) of the Partnership Act. (See *Monteleone*, 147 Ill. App. 3d at 269.) This section of the Act provides in relevant part:

> "(2) When dissolution is caused in contravention of the partnership agreement the rights of the partners shall be as follows:

(a) Each partner who has not caused dissolution wrongfully shall have,

\* \* \*

II. The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement.

(b) The partners who have not caused the dissolution wrongfully, if they all desire to continue the business in the same name, either by themselves or jointly with others, may do so, during the agreed term for the partnership and for that purpose may possess the partnership property, provided they secure the payment by bond approved by the court, or pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, less any damages recoverable under clause (2a II) of this section, and in like manner indemnify him against all present or future partnership liabilities.

(c) A partner who has caused the dissolution wrongfully shall have:

\* \* \*

II. If the business is continued under paragraph (2b) of this section the right as against his co-partners and all claiming through them in respect of their interests in the partnership, to have the value of his interest in the partnership, less any damages caused to his co-partners by the dissolution, ascertained and paid to him in cash, or the payment secured by bond approved by the court, and to be released from all existing liabilities of the partnership; but in ascertaining the value of the partner's interest the value of the good will of the business shall not be considered." Ill. Rev. Stat. 1987, ch. 106½, par. 38(2).

However, because plaintiffs did not continue the partnership after discovering that defendant had wrongfully transferred all the partnership rights to a third party and because there was no dissolution after the Memorandum was signed, section 38(2) of the Partnership Act does not apply.

In their cross-appeal, plaintiffs assert that the trial court erred in denying their motion for a new trial on damages only. Since the jury awarded both plaintiffs compensatory damages and found defendant liable for punitive damages, but assessed those damages at $0, plaintiffs argue that the jury disregarded the jury instructions. Plaintiffs do not raise the inadequacy of the compensatory

damages, but only the inadequacy of the punitive damages. They argue that the assessment of $0 in punitive damages makes a mockery of the verdict.

■ To be inadequate, the damages must be clearly against the manifest weight of the evidence in that the size of the award is a result of passion or prejudice, where the amount is palpably inadequate, or where the jury disregarded proven elements of damages. (*Barr v. Groll* (1991), 208 Ill. App. 3d 318, 322.) Even though punitive damages can be awarded when a wrongful act involves a violation of a fiduciary duty (*Home Savings & Loan Association v. Schneider* (1985), 108 Ill. 2d 277, 284), the amount of any such award does not have to be proportionate to the compensatory damages. (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 711.) The amount of punitive damages is a matter for the jury's sound discretion. *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 581.

■ A challenged jury verdict must be examined to ascertain the jury's intention in returning the verdict. (*Anderson v. Smith* (1980), 91 Ill. App. 3d 938, 940.) If the verdict is supported by the pleadings and evidence, it must be liberally construed and may be molded into form unless it is unclear or there is doubt as to its meaning. (*Anderson*, 91 Ill. App. 3d at 940.) Moreover, in Illinois, punitive damages are not favored. *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 211.

■ The jury determined that defendant wrongfully terminated the partnership and awarded specific compensatory damages to both plaintiffs. Although the jury signed a verdict form that found for both plaintiffs and against defendant on the question of punitive damages, which they assessed in the sum of $0, it is clear that the jury intended that no punitive damages be awarded. Since punitive damages are not favored, the jury did not abuse its discretion in awarding $0 in punitive damages. Therefore, the trial court did not err in denying plaintiffs' motion for a new trial on damages only.

Based on the foregoing, we affirm the circuit court's denial of defendant's motion for a judgment notwithstanding the verdict and plaintiffs' motion for a new trial on damages only.

Affirmed.

RIZZI and GREIMAN, JJ., concur.